Filed 9/19/25  P. v. Marende CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B332859 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. KA124385 |
| v. | |
| KYLE HENRY MARENDE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Seth P. McCutcheon and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

Kyle Henry Marende appeals from a jury verdict convicting him of first degree murder and possession of a firearm by a felon. On appeal, Marende contends that the trial court erred in admitting statements he made to an undercover agent while he was in custody implicating himself in the murder. He argues that the admission of his statements violated his Fifth Amendment right against self-incrimination and his right to exclude involuntary admissions under the Fourteenth Amendment. Marende also contends that the trial court erred in failing to instruct the jury to consider the reliability of his statements. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Homicide*

On November 9, 2014, at around 8:30 p.m. in Pomona, California, Marende, Paul Wiley, and Leotis Henson were in a car driven by Renall Sanford. They were members of the 4-5-6 Island Piru gang. Marende was known as "K Dogg." The four individuals decided to look for rival gang members and "shoot at them." Wiley was armed with a .22 caliber semiautomatic pistol. Marende had a .38 caliber revolver.

Wiley and Marende exited the vehicle and walked down an alley. They encountered Tory Lawton in a carport. Marende asked Lawton where he was from, and Lawton replied that he was from Southside Village. Southside Village was a rival of the 4-5-6 Island Piru gang. Marende and Wiley fired their handguns at Lawton and ran back to the car. Sanford dropped off Marende and Wiley at Wiley's house, where Marende was living at the time.

2

According to a detective who responded to the scene of the shooting, Lawton died while being transported in an ambulance for treatment. The medical examiner who performed the autopsy found that Lawton suffered three gunshot wounds. The wounds were to his right upper back, right foot, and left upper back. The medical examiner determined the wound to the left upper back to be an immediately life-threatening injury, unlike the other wounds. The gunshot to Lawton's left upper back went through his left lung, aorta, and right lung. Lawton died from the aggregate blood loss that resulted from all his wounds. The medical examiner recovered three projectiles from Lawton's body.

On November 17, 2014, eight days after Lawton's murder, Marende was shot around midnight while sitting outside of the apartment of Wiley's stepfather. Marende went to Wiley's house across the street, and Wiley called the police. When Marende told Wiley that he left his gun, shoes, and cell phone at Wiley's stepfather's apartment, Wiley left to retrieve the items. The police arrived at the scene of Marende's shooting, where a police officer found a revolver, a cell phone, and two sandals.

### Wiley's Plea Agreement

In 2018, Wiley was arrested in an unrelated case. He was charged with three counts of attempted murder, one count of shooting into an occupied vehicle, one count of possession of a concealed firearm, and one count of child endangerment, with gun and gang enhancements attached to various counts. While in custody, Wiley entered into a proffer agreement, wherein he told the prosecuting attorneys about the Lawton murder in exchange for possible leniency.

Wiley testified at Marende's trial pursuant to a plea agreement. Under the agreement, Wiley's sentence was reduced

from 140 years-to-life to 15 years in state prison.  Wiley was not charged in Lawton's murder.

### *Forensic Investigation*

At the scene of Marende's shooting, the police recovered a .38 caliber revolver.  The county crime laboratory compared the projectiles recovered from Lawton's body with test fires from the revolver.  The comparison revealed that one of the three projectiles provided by the medical examiner's office had been fired from the revolver.  As to the other two projectiles, one was a .22 caliber, and the other was a .38 caliber, but it was too damaged to be conclusively matched to the revolver.

The laboratory also compared DNA from the revolver with a DNA sample from Marende.  The comparison revealed that the DNA from the revolver was a mixture from three contributors, with Marende having contributed the most DNA of the three.  A review of the data from the cell phone recovered from the scene of Marende's shooting showed that its user had an email address of KAYDOGG456@gmail.com.  The phone had a picture of a .38 caliber revolver similar to the revolver recovered at the scene.

*The Perkins[1] Operation*

### 1.    First *Perkins* session

Marende was arrested in 2020 and transported to the Pomona City Jail.  The arresting detective told Marende that he was being arrested for a 2014 murder and that his DNA was found on a recovered firearm.  The police arranged for Marende to be placed in a cell with an undercover agent, with their conversation monitored and recorded.

According to the transcript of the recorded conversation, when Marende entered the cell, the agent greeted him by saying, "What's up, man?"  The agent portrayed himself as almost 46 years old and having "been there and done it."  The agent described himself as having committed a lot of crimes and having done previous stints in prison.  When Marende told the agent that he was arrested for a murder that took place in 2014, the agent told Marende he had fought a "hot one" for four years. Marende described his criminal history and his experience at various county facilities.  The agent affirmed his respect for Marende because Marende was "real," despite being younger.

When Marende wondered why he was arrested six years after the murder, the agent theorized that, "nine times out of ten," someone the arrestee knew who was in jail was "running

---

[1]    In *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), the United States Supreme Court held that an undercover law enforcement officer posing as a fellow inmate was not required to give warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) to an incarcerated suspect before asking questions that could elicit an incriminating response. (*Perkins*, at pp. 292, 295–297.)

they . . . mouth" or the police had DNA evidence.  Marende believed he was arrested because "[s]omebody said something." Marende divulged to the agent that the police told him DNA was found on a murder weapon and that the gun was a .38 caliber. The agent speculated that someone Marende knew was arrested and offered incriminating information on Marende.  Marende told the agent that he suspected Wiley of talking because Wiley had been in custody awaiting trial on attempted murder charges for two years.  Later in the conversation, Marende questioned why Wiley would offer information on his involvement in the murder. Because Marende was there, he could implicate Wiley, as well. The agent asked Marende what Wiley did with the other gun, to which Marende responded that he had no idea.

When the agent brought up the DNA on the murder weapon, Marende said the police obtained the weapon one or two weeks after the murder when he was shot.  Marende recounted how he told Wiley to retrieve his gun and phone at Wiley's stepfather's apartment after he was shot.  Marende also indicated that Wiley was unable to retrieve his items because the police had arrived.

On the issue of requesting an attorney, the agent advised Marende to listen to the police in order to ascertain what evidence they had against him:

"[Agent]:  Let me tell you something.  When you talk to these motherfuckers, don't go over there and be, like, oh, oh, I ain't got nothing to say.  I want a lawyer.  I – I can't tell you what to do, homie. [¶] . . . [¶]  I'm just telling you what I would do.

"[Marende]:  Yeah.  Okay. . . .

"[Agent]:  When you do that –

6

"[Marende]:  That shows – [¶] . . . [¶] – I'm – I'm guilty.

"[Agent]:  That – that's one of them, but then again, you're not getting ahold of what they got on you.

"[Marende]:  What they know.

"[Agent]:  [You] got to hear what the – just 'cause they talking to you and you say, okay, I want to see what y'all – I'll talk to you.  I'ma see what you're talking about.  You tell – you let them do the talking.  You listen.

"[Marende]:  Listen, yeah.  First part is listening.

"[Agent]:  You listen.  [¶] . . . [¶]  You ain't got to say what the fuck they want you to say.  [¶] . . . [¶]  But you listen.

"[Marende]:  Right.

"[Agent]:  That's how you get your knowledge.  Yeah.

"[Marende]:  What – what I'm working with.  [¶] . . . [¶]  How – how to play it. . . .

"[Agent]:  [F]irst, you want to let them talk to you.  They're gonna try to ask you their questions.  That's when you don't know.  Tell me what you – you know, what you got me here for?  [¶] . . . [¶]  Tell me what the fuck going on.  You know what I'm saying?

"[Marende]: Right.  [¶] . . . [¶]  If they ask me anything, I'm denying what they tell me. . . .

7

"[Agent]: Exactly. Exactly. . . . [¶] . . . [¶] Like I said, you listen . . . [¶] . . . [¶] But you – you got to listen so you get the –

"[Marende]: So I understand what they need.

"[Agent]: Yeah. Because you – they coming at you with the facts. And you know – you gonna know what they saying and how they got that."

The agent told Marende multiple times that, while he did not have to talk to the police, Marende needed to let the police talk to him and he needed to listen. Marende's objective when talking with police, according to the agent, was to "sit down," listen, and "keep it at that." Marende understood, indicating that the plan "[made] sense" and was "[s]omething [he] could work." By listening, Marende could learn what he was "working with" and "what [the police] need."

### 2. Marende's interrogation

Marende was then removed from the cell to be interviewed by police. A detective read Marende his *Miranda* rights and asked if he understood. Marende responded, "Uh-huh."

The detective told Marende that he was suspected in the 2014 murder of Lawton. The detective presented a report indicating that Marende's DNA was on the revolver, phone, and sandal recovered the night he was shot. The detective also presented a ballistics report showing that a projectile recovered from Lawton's body was fired from the revolver. Marende denied knowing how his DNA was on the revolver and being present at the time of the murder. The detective also showed Marende a picture of Sanford, claiming that Sanford was a member of the 4-

5-6 Island Piru gang and had implicated Marende in the shooting of Lawton.  Marende denied both knowing Sanford and being a member of the gang.

The detective testified at trial that the ballistics report was real, but the report representing that Marende's DNA was on the revolver was fabricated.  At the time of the interview, the police had not yet ascertained that Marende's DNA was on the revolver.  Sanford also had not identified Marende prior to the interrogation.  The detective wanted Marende to believe that the police had more evidence than they did to determine what statements Marende would make to the agent when he was returned to the recorded cell.

### 3.     Second *Perkins* session

After the interrogation, Marende was returned to the cell with the *Perkins* agent.  Marende told the agent that, during the interrogation, the police told him his DNA was on the murder weapon and Sanford had identified him as having been present at the murder.  The agent then asked, referring to Sanford, "What did he do?"  Marende confirmed that Sanford was driving the car to and from the murder scene.

Upon further questioning from the agent, Marende said that Wiley shot the .22 firearm.  Marende also stated that there was another person in addition to Wiley and Sanford who waited in the car on the night of the murder.  Marende and the agent then attempted to deduce whether the informant was Sanford or Wiley.[2]  Marende was later removed from the cell.

---

[2]     The People argued in closing arguments that, during this session, Marende admitted to firing the .38 caliber weapon, claiming the audio was clearer than the transcript suggested.

*Trial Proceedings*

### 1.    Motion to exclude statements to *Perkins* agent

Prior to trial, co-defendant Sanford moved to exclude Marende's post-*Miranda* statements to the *Perkins* agent on due process grounds.  Sanford argued that the agent impermissibly advised Marende against invoking his right to remain silent and his right to counsel.  Sanford subsequently pled.[3]  Marende, however, joined Sanford's motion and sought to exclude evidence from the *Perkins* operation.

The trial court denied the motion.  The court recognized that the *Perkins* agent did more than listen to Marende and gather information for the prosecution:  "It is abundantly clear that the *Perkins* agent offered a suggestion to Mr. Marende as to what he should do . . . to . . . understand[ ] the extent of the investigation and what, if anything, was going to implicate Mr. Marende in the underlying offenses . . . ."  Nevertheless, the court determined that Marende was not coerced into a police interview, stating, "The *Perkins* agent reiterated time and time again that . . . he's not telling Mr. Marende that he should talk to law enforcement.  He said, 'You don't have to do that.  You should listen rather than talk.'  He stressed that point, which is a suggestion that Mr. Marende took advantage of and agreed with and conducted himself accordingly."

---

However, the transcript, which we rely upon for our analysis, does not reflect such an express admission.

[3]    Sanford's plea is not contained in the record, but the plea is undisputed.

10

During trial, the prosecution called the homicide detective who monitored the *Perkins* operation as it was occurring. During the detective's testimony, the prosecution played for the jury the entire recording of the *Perkins* operation, accompanied by a transcript. The People also played Marende's statements from the *Perkins* operation in closing arguments.

### 2. Jury instructions

As relevant to this appeal, the trial court instructed the jury with CALCRIM Nos. 226, 358, and 359. CALCRIM No. 226 states that the jury, using common sense and experience, "must judge the credibility or believability of the witnesses." The instruction also lists several factors to consider in evaluating the testimony of a witness, including: "Did other evidence prove or disprove any fact about which the witness testified?" Marende sought to add language for the jury to consider a witness's character for truthfulness. Finding Marende's request to be pertinent to Wiley's testimony, the trial court concluded the request was already addressed by the other factors listed in CALCRIM No. 226.

CALCRIM No. 358 pertains to evidence of a defendant's oral statements. The trial court instructed the jury to determine whether the defendant made any of the oral statements, in whole or in part, and to "decide how much importance to give to the statements." The court also instructed the jury to "[c]onsider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

CALCRIM No. 359 states that the defendant "may not be convicted of any crime based on his out-of-court statements alone." The jury may rely on the out-of-court statements only if it

11

"first conclude[s] that other evidence shows that the charged crime was committed."

Marende did not object to CALCRIM Nos. 358 or 359. Nor did he request any clarifying or amplifying language for those instructions.

### 3. The verdict, sentence and appeal

The jury found Marende guilty of willful, deliberate, and premeditated first degree murder, in violation of Penal Code section 187, subdivision (a) (count 1). The jury also found that, in committing the murder, Marende personally used a firearm (Pen. Code, § 12022.53, subd. (b)); personally and intentionally discharged a firearm (*id.*, § 12022.53, subd. (c)); and personally and intentionally discharged a firearm causing death (*id.*, § 12022.53, subd. (d)). The jury further found Marende guilty of possession of a firearm by a felon, in violation of Penal Code section 29800, subdivision (a)(1) (count 2).

The trial court sentenced Marende to 50 years to life on count 1 and imposed and stayed a concurrent middle term of two years on count 2. Marende timely filed a notice of appeal.

## DISCUSSION

Marende argues that the judgment must be reversed because the trial court erred in (1) admitting the recordings of the *Perkins* operation and his interrogation, and (2) failing to properly instruct the jury. For the reasons set forth below, we find no error.

## I. The Trial Court Did Not Err in Admitting Recordings of the *Perkins* Operation and Statements from Marende's Police Interrogation

Marende first contends that the trial court erred in failing to exclude his admissions to the *Perkins* agent regarding the Lawton murder and his denials during his interrogation. Marende maintains that his statements were made in violation of *Miranda* and were otherwise involuntary, as the *Perkins* agent, acting on behalf of law enforcement, deliberately coaxed him to waive his constitutional rights. We begin by reviewing the well-settled legal principles applicable to the issue.

### A. *Governing law and standard of review*

In *Miranda*, *supra*, 384 U.S. 436, the United States Supreme Court held that, pursuant to the Fifth Amendment's protection against compelled self-incrimination, suspects in police custody must be advised prior to any questioning that they have the right to remain silent, that anything they say can be used as evidence against them, and that they have the right to the presence of an attorney, either retained or appointed. (*Id.* at pp. 444, 478–479.) The warning was meant to overcome the "inherently compelling pressures" during custodial interrogations "which work to undermine the [accused]'s will to resist and to compel him to speak where he would not otherwise do so freely."

13

(*Id.* at p. 467.)  The police may not further interrogate a suspect who has invoked the right to counsel until counsel is provided, unless the suspect "initiates further communication, exchanges, or conversations with the police."  (*Edwards v. Arizona* (1981) 451 U.S. 477, 485.)  "Statements obtained in violation of *Miranda* are inadmissible to establish guilt."  (*People v. Sims* (1993) 5 Cal.4th 405, 440.)

Under *Perkins, supra,* 496 U.S. 292, "when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement," no *Miranda* warning is required.  (*Id.* at p. 294.)  In *Perkins*, the police placed an undercover agent in the same cellblock as a suspect to investigate the suspect's connection to a murder.  (*Id.* at pp. 294–295.)  The agent did not provide a *Miranda* warning before conversing with the suspect.  (*Id.* at p. 295.)  When the agent asked the suspect if he had ever killed anyone, the suspect described details of the murder that the police were investigating.  (*Ibid.*)

The United States Supreme Court held that the coercive pressures of custodial interrogation "are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate," as opposed to a police officer.  (*Perkins, supra,* 496 U.S. at p. 296.)  "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner."  (*Id.* at p. 297, italics added.)  Statements obtained voluntarily and without coercion are admissible evidence.  (*Ibid.*)

Prior to *Miranda,* "[i]t [had] long . . . been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal

14

suspect by coercion." (*People v. Neal* (2003) 31 Cal.4th 63, 79 [citing pre-*Miranda* U.S. Supreme Court cases].) "A defendant's statements challenged as involuntary are inadmissible at trial unless the prosecution proves by a preponderance of the evidence that they were voluntary." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093 (*Guerra*), overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Statements obtained by threats or promises are involuntary. (*Neal*, at p. 79.) Voluntariness turns on the totality of the circumstances, including a consideration of whether the defendant's will to resist was overborne by the circumstances of the interrogation. (*Guerra*, at p. 1093.)

On review of a trial court's decision on whether a defendant's statements were admissible under *Miranda*, "we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." (*People v. Davis* (2009) 46 Cal.4th 539, 586.) Similarly, on review of a trial court's decision that a statement obtained by a law enforcement officer was voluntary, "[w]e review the trial court's findings as to the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation, for substantial evidence." (*Guerra*, *supra*, 37 Cal.4th at p. 1093.) We independently review the trial court's "determinations as to whether coercive police activity was present and whether the statement was voluntary." (*Ibid.*)

Here, because Marende's statements to the *Perkins* agent were recorded, the facts are undisputed. (See *People v. Leon* (2020) 8 Cal.5th 831, 843.) Accordingly, we decide de novo

15

whether the undercover agent's procurement of Marende's statements violated *Miranda* and whether they were voluntary.

### B.     *Analysis*

Marende's claims address both his denials during his police interrogation and his admissions to the *Perkins* agent.  Marende argues that *Perkins* does not address whether an undercover agent "may coax a suspect to waive his rights and talk to police during his subsequent interrogation."  Marende's contention is not relevant to his interrogation here.  There is no dispute that Marende waived his *Miranda* rights before speaking with police during his interrogation.  Marende cites to no legal authority in support of his contention that this waiver was not valid or that these statements were involuntary.  (See *People v. Cruz* (2008) 44 Cal.4th 636, 669 [defendant's willingness to answer questions after affirming on record his understanding of *Miranda* rights constituted valid implied waiver of rights].)  Nor does Marende identify any incriminating statements made during the interrogation.  When the police presented Marende with the purported evidence against him, he consistently denied having any involvement in the crime.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 994 [statements that were not inculpatory did not contribute to defendant's conviction in light of entire record].)  Marende's argument centers on the incriminating statements he made to the *Perkins* agent.

Marende contends that the *Perkins* operation violated his *Miranda* rights and rendered his statements involuntary because his admissions to the agent and false denials during the interrogation were "obtained by police tactics that overbore his ability to freely choose whether or not to . . . waive . . . his right to remain silent."  Marende maintains that the agent invoked his

16

expertise and experience in criminal matters to "trick[ ] Marende into trusting him." As a result, Marende asserts that the agent was used to "achieve[ ] covertly what law enforcement may not do overtly," in violation of his due process rights.

Marende's argument lacks merit. Because Marende never invoked his right to remain silent or his right to counsel during his interrogation, there is no question that the statements made to the agent outside of the interrogation were admissible.[4] When Marende made his admissions—including that he was present at the murder, that Sanford drove Wiley and him to the scene of the murder, and that Wiley shot a .22 caliber firearm—he did so under the belief that the agent was a fellow prisoner, not a law enforcement officer. "Coercion is determined from the perspective of the suspect." (*Perkins*, *supra*, 496 U.S. at p. 296.) The pressures of a custodial interrogation, which may compel suspects to speak, are not present where suspects are unaware they are speaking to government agents. (*Id.* at pp. 296–297.) "There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (*Ibid.*)

---

[4]  Had Marende invoked his *Miranda* rights during the interrogation, the question would be more complicated. The California Supreme Court has granted review in a case finding that *Miranda* did not apply where a defendant spoke to a police agent he believed was an inmate, even though the defendant invoked his right to remain silent three days earlier. (See *People v. Allen* (July 22, 2024, B328333) [nonpub. opn.], review granted Nov. 20, 2024, S286520.) Here, however, Marende did not invoke any *Miranda* rights.

17

Where an undercover agent practices deception without any compulsion or coercion, no *Miranda* warning is required. (*Perkins*, *supra*, 496 U.S. at p. 297.) "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Ibid*.) "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray* (1996) 13 Cal.4th 313, 340.) The agent in the instant case simply pretended to be an experienced criminal, which lulled Marende into confirming details of the murder.

Marende contends that this case differs from typical *Perkins* operations because the agent here actively advised him to waive his *Miranda* rights during the interrogation, rather than passively listening to his admissions. We disagree. The agent did advise Marende about how to approach the police interrogation, but this advice did not create a custodial interrogation requiring *Miranda* warnings. The agent repeatedly clarified that he was merely offering suggestions, stating, "I can't tell you what to do, homie," and "I'm just telling you what I would do." The agent emphasized that Marende only needed to "listen," not speak to police. Marende understood this strategy and found it "[made] sense."

There is no evidence on this record of coercion on the part of the agent. The agent did not intimidate Marende or force him to speak about the murder. Nor did the agent make Marende believe that he could affect how the police treated him. (See *Perkins*, *supra*, 496 U.S. at p. 298 [defendant had no reason to feel undercover agent had any legal authority].) Instead, the

18

agent obtained Marende's trust by pretending to have broad experience with the criminal justice system, eliciting Marende's admissions.  The coercive atmosphere that *Miranda* was designed to address simply was not present from Marende's perspective.  Rather than being coerced, Marende freely confided details of the murder to determine who had informed on him.  This falls squarely within the permissible "strategic deception" that *Perkins* explicitly allows.  (*Id.* at p. 297.)

Marende's reliance on *Missouri v. Seibert* (2004) 542 U.S. 600 is misplaced.  *Seibert* involved a police officer who deliberately obtained a confession, then *Mirandized* the suspect and repeated the interrogation to cure any *Miranda* violation. (*Id.* at pp. 604–606.)  Here, the incriminating statements were made to the undercover agent, not during a police interrogation, which yielded only denials.  The two-step violation condemned in *Seibert* is not present.

Absent any coercion and without any invocation of his *Miranda* rights, statements made by Marende to the *Perkins* agent were admissible.[5]  We now address whether the trial court was required to instruct the jury to consider the circumstances under which Marende's admissions were made.

---

[5]     Because we find no error in the admission of Marende's statements to the *Perkins* agent or from his interrogation, we need not address whether the admission of the statements was harmless error.

## II.     The Trial Court Did Not Err in Instructing the Jury

Citing *Crane v. Kentucky* (1986) 476 U.S. 683 (*Crane*), Marende next contends that the trial court erred in failing to instruct the jury to determine the reliability of his admissions to the undercover agent.  Recognizing there is no CALCRIM instruction on point, Marende argues that the trial court had a sua sponte duty to fashion an appropriate instruction with input from counsel.

### A.     *Applicable legal principles and standard of review*

"It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047).  However, a trial judge "must instruct only on general principles that are necessary for the jury's understanding of the case; the judge need not instruct, without request, on specific points or special theories that might be applicable to the particular case." (5 Witkin, Cal. Criminal Law (5th ed. 2025) Criminal Trial, § 707, p. 1047.)

We review claims of instructional error de novo. (*People v. Thomas* (2023) 14 Cal.5th 327, 382 (*Thomas*).)  "The pertinent inquiry is whether the instructions as a whole fully and fairly set forth the applicable law.  [Citation.]  In making that determination, we assume that jurors are intelligent persons capable of understanding and correlating all jury instructions which are given and, where reasonably possible, we interpret the instructions to support the judgment." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1152.)

20

### B. Analysis

As a preliminary matter, the People argue that Marende forfeited the claim of instructional error because he did not raise the issue before the trial court. (See *People v. Temple* (2025) 110 Cal.App.5th 1281, 1293 ["A defendant may not claim on appeal that a jury instruction which correctly states the law is incomplete, misleading, or too general unless the defendant had requested clarification or amplification of the instruction in the trial court."].) However, "[a] failure to object . . . does not prevent a defendant from challenging an instruction on appeal if the asserted error affected the defendant's substantial rights." (*Thomas, supra*, 14 Cal.5th at p. 382; see also Pen. Code, § 1259.) Because Marende's challenge involves his Fifth and Fourteenth Amendment rights, we consider the challenge in the first instance. We nonetheless find that the trial court had no sua sponte duty to issue additional cautionary instructions on defendant's extrajudicial admissions.

Marende cites *Crane* in arguing that the trial court had a sua sponte duty to instruct "on the jury's duty to determine [a confession's] credibility," " ' "including facts bearing on its weight and voluntariness." ' " Marende notes CALCRIM has no model instruction advising the jury what factors may be considered in deciding the credibility of a confession or admission under *Crane*, but argues CALJIC has instructions that define confession and admission and instruct the jury that it must decide whether the defendant made a confession or admission and whether it was true. Marende contends that, despite the unavailability of a CALCRIM instruction, the trial court had a sua sponte duty to fashion an appropriate instruction or adopt the CALJIC instructions.

Marende's reliance on *Crane* is misplaced. In *Crane*, the trial court denied the defendant's motion to suppress his confession prior to trial, finding the confession was voluntary. (*Crane*, *supra*, 476 U.S. at pp. 683–684.) The trial court then excluded trial testimony about the circumstances of the defendant's confession—the physical and psychological environment in which the confession was obtained—on the ground that the testimony pertained solely to the issue of voluntariness and was therefore inadmissible. (*Ibid.*) The United States Supreme Court reversed, holding that exclusion of the testimony about the circumstances of the defendant's confession deprived him of his constitutional right to a fair opportunity to present a defense. (*Id.* at pp. 683, 689–691.) The Supreme Court reasoned that the defendant had a right during trial to present evidence of the circumstances that yielded the confession to challenge its credibility and reliability. (*Ibid.*) *Crane* did not discuss or address jury instructions.

Here, Marende was not denied a fair opportunity to present a defense. He was permitted to present evidence about the circumstances of his admissions to the *Perkins* agent. Marende has cited no legal authority, nor are we aware of any, holding that a trial court has a sua sponte duty to formulate and give an instruction based on *Crane*, informing jurors that they must determine the reliability of a defendant's confession and identifying factors relevant to that inquiry.

In contrast, in *People v. Diaz* (2015) 60 Cal.4th 1176 (*Diaz*), the California Supreme Court held that, absent a request, the trial court was not required to instruct the jury to consider a defendant's out-of-court statements with caution. (*Id.* at pp. 1190–1191.) The *Diaz* Court explained: "The cautionary

22

instruction on admissions is no longer '*necessary* for the jury's understanding of the case' [citation] because courts are now required to instruct the jury, in all criminal cases, concerning the general principles that apply to their consideration of witness testimony." (*Id.* at p. 1190.)[6]

In the instant case, the jury was instructed with CALCRIM Nos. 358 and 359, addressing how it was to evaluate Marende's statements. CALCRIM No. 358 instructed jurors "to decide how much importance to give to [Marende's] statements" and to "consider the statements, along with all the other evidence, in reaching [their] verdict." With CALCRIM No. 359, jurors were instructed that Marende could "not be convicted . . . based on his out-of-court statements alone" and they could rely on his out-of-court statements to convict him only if they first concluded other evidence showed the charged crime was committed.

Jurors were also instructed with CALCRIM No. 226, specifically that they, alone, "must judge the credibility or believability of the witnesses," and that "[i]n evaluating a witness's testimony, [they] may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." The instruction sets forth multiple factors the

---

[6] Marende attempts to distinguish *Diaz* by arguing that recorded statements require a different jury consideration than unrecorded statements, and that reliability factors differ from general credibility assessments. Marende cites no legal authority in support of his assertion. *Diaz* articulated no such limitation. Both credibility and reliability address whether out-of-court statements are to be believed. (See *Crane, supra,* 476 U.S. at p. 688 [because credibility of confession is for the jury, defendant has prerogative to challenge confession's reliability during trial].)

23

jurors may consider, including "[h]ow reasonable is the testimony when [they] consider all the other evidence in the case[.]" Under this instruction, jurors were permitted to consider the deception and statements of the undercover *Perkins* agent.

These pattern jury instructions are accurate statements of the law. (See *People v. Lee* (2011) 51 Cal.4th 620, 638 [trial court has no sua sponte duty to revise or improve upon an accurate statement of the law without a request from counsel].) With CALCRIM Nos. 226, 358, and 359, the jurors were adequately instructed on how they could consider Marende's statements during the *Perkins* operation. Marende has failed to identify any other case-specific points that should have been instructed or to show any error by the trial court in failing to give additional instructions.[7]

---

[7] Since we find no instructional error, it is unnecessary to address the People's contention that any error was harmless.

24

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


GAAB, J.*


We concur:



EDMON, P. J.



ADAMS, J.

---

*     Judge of the Fresno County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.